WO

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

Frances Alday et al.,                    )
                                         )
                  Plaintiffs,            )
                                         )        CV 06-32 TUC DCB
v.                                       )
                                         )        **O R D E R**
Raytheon Company, a Delaware corporation, )
                                         )
                  Defendant,             )
_____ )

The Court grants summary judgment for Plaintiffs and denies summary judgment for Defendant.  Having entered Judgment for Plaintiffs, the Plaintiffs' Motion for Preliminary Injunction is denied as moot.

A.    Background

Plaintiffs, early retirees, seek relief under Section 301(a) of the Labor Management Relations Act (LMRA) against Defendant, Raytheon, for allegedly breaching collective bargaining agreements (CBAs) spanning a period of over fourteen years (beginning in 1990 and ending in 2004).  Plaintiffs allege these CBAs ensured that they and their spouses would have company-paid health care coverage until age 65.[1]  Plaintiffs also sue Raytheon under the Employee Retirement Income Security Act of 1974 (ERISA), challenging the change in 2004 which requires them to contribute toward the cost of their retiree healthcare benefits.

---

[1]Specifically, the Employer agreed to *continue providing "the Comprehensive Medical Plan coverages for which they were covered while active employees,* until the retired employee attains age 65, his or her eligible spouse attains age 65, and the retired employee's dependent child reaches age twenty-one (21), or age twenty-five (25), if attending an accredited college, university, or career-oriented educational institution."  (Ps' MSJ, SOF, Ex. 7: 1990 CBA at Article XIII, § D(1)).

1

2       On January 4, 2008, this Court certified this case as a class action law suit after

3   dismissing Plaintiffs' claims for extra-contractual and punitive damages.  The parties jointly

4   agreed to a class definition, pursuant to parameters determined by the Court, which was

5   approved by the Court on February 15, 2008.

6       The parties filed motions for summary judgment,[2] and the Plaintiffs seek a Preliminary

7   Injunction.  Plaintiffs argue that under the CBAs their retiree health care benefits were vested

8   rights, which could not be unilaterally modified by Raytheon and must be restored.  Under

9   ERISA, these are the benefits due them.  Raytheon argues that the retirees have no vested right

10  to "free" health care benefits under the CBAs and that under ERISA and the governing Plan

11  documents, it had the right to change Plaintiffs' health care benefits, including requiring retirees

12  to pay a share of the health insurance premium.  Raytheon asks the Court to enter judgment for

13

14  ─────────────────

15  [2]The parties did not file crossmotions, which is appropriate when both parties seek summary
    judgment on the same issue.  Instead, the parties positions were fully briefed by separate
16  motions filed simultaneously on May 15, 2008.  Instead of considering a motion, crossmotion,
    response, and reply, this Court has considered two motions, two responses, and two replies.
17  Additionally, Raytheon filed a Sur-Reply.

18      Raytheon asks the Court to grant it summary judgment because Plaintiffs failed to
    respond to Raytheon's assertion that it prevails under ERISA and because Plaintiffs failed to
19  file a Statement of Facts in support of its Opposition to Raytheon's Motion for Summary
    Judgment.  Under L.R. Civ. 56.1, a Statement of Facts is deemed admitted, unless otherwise
20  ordered by the Court, if it is "not specifically controverted by a correspondingly numbered
    paragraph in the opposing party's separate Statement of Facts."  Here,  Plaintiffs relied on the
21  Statement of Facts submitted in support of its Motion for Summary Judgment.  While the local
    rule envisions Respondent's filing a correspondingly numbered answering Statement of Facts
22  and a Statement of Facts supporting its Response, Fed. R. Civ. P. 56, requires only that material
    assertions of fact must be controverted.  This has been done, and the Court will not grant
23  summary judgment for Raytheon based on deemed admissions.  Here, the one Statement of
    Facts sufficed.  Plaintiffs did respond to Defendant's ERISA claim by arguing that if they
24  prevail under the LMRA based on the CBAs, they prevail as well under ERISA.  Plaintiffs'
    Response to Raytheon's Motion for Summary Judgment was the same argument made in the
25  Plaintiffs' Motion for Summary Judgment: whether or not Plaintiffs' "free" medical benefits
26  are vested rights that cannot be changed by Raytheon.  The question has been adequately briefed
    by the parties.
27

28

1  it because it did not breach the CBAs, and the retirees have received all the benefits due them

2  under the terms of their ERISA plan.

3         It is undisputed that until 2004, Defendant provided "free" health care benefits for early-

4  retirees without any requirement that retirees pay any coverage premiums.  Effective July 1,

5  2004, Defendant began charging retirees a share of the cost of coverage for their retirement

6  medical benefits.

7  B.   Employee Retirement Income Security Act: (ERISA)

8         The parties agree that the retiree health benefits at issue here are "employee welfare

9  benefits" under ERISA and are not "employee pension benefits." Unlike employee pension

10 benefit plans, employee welfare plans are exempt from ERISA automatic vesting requirements.

11 *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995); *Massachusetts v. Morash,* 490

12 U.S. 107, 119 (1989); *DeVoll v. Burdick Painting, Inc.,* 35 F.3d 408 (9th Cir.1994); *West v.

13 Greyhound Corp.,* 813 F.2d 951, 954 (9th Cir.1987). "Retiree medical benefits do not become

14 vested once an employee becomes eligible or retires." *Williams v. Caterpillar, Inc.,* 944 F.2d

15 658 (9th Cir.1991).

16        Consequently, unless established contractually by ERISA plan documents, employees

17 have no guaranteed right to continued medical benefits.  *Alday v. Container Corp.,* 906 F.2d

18 660, 665 (11th Cir.1990). Absent a contractual obligation, an employer may terminate a welfare

19 plan at will. *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 295 (4th Cir.1993).

20        Furthermore, ERISA recognizes the employer's inherent right to modify or terminate its

21 welfare plans, therefore, Plaintiffs bear the burden of proving that Raytheon waived this right

22 by committing to vested benefits. *See, Tusting v. Bay View Fed. Sav. & Loan Ass'n,* 789 F.Supp.

23 1034, 1041 (N.D.Cal.1992), (citing *Howe v. Varity Corp.,* 896 F.2d 1107, 1109 (8th Cir.1990)).

24 Plaintiffs must show the grant exists "in the plan documents" in "clear and express" language.

25 *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1441 (9th Cir. 1995).

   /////

26 /////

27

28

C.   The Plan Documents.

It is undisputed that under the ERISA Plan documents, Plaintiffs have no vested right to medical benefits, including free medical coverage.  Instead, the Plan contained anti-vesting language, clearly and expressly, stating: "No Vested Right to Benefits.  No Participant, or person claiming through such participant, shall have any right to, or interest in, any benefits provided under this Plan upon . . . retirement . . . except as specifically provided under a Benefit Program."  (D's Motion for Summary Judgment (MSJ) at 6; Statement of Facts (SOF) at 52 (citing 1999 and 2003 Plan)) (emphasis added).  In 1997, the Employer reserved its "right to alter, amend, modify, revoke or terminate in whole or in part the Plan, *except as provided in any agreement with a Collective Bargaining Agent*."  (D's SOF, Ex. D(2): 1997 Plan at 30) (emphasis added).

It is undisputed that the Plan documents contained reservation of rights clauses, which gave Raytheon the "absolute" right to "amend the Plan and any or all Benefit Programs incorporated herein from time to time, including, but not limited to, the right to reduce or eliminate benefits provided pursuant to the provisions of the Plan or any Benefit Program as such provisions currently exist, or may hereafter exist."   (D's MSJ at 6; SOF at 51 (citing Second Amended Complaint at 17, 21.))

It is undisputed that the Summary Plan Description (SPD) contained the "no vesting" language and the reservation of rights provisions.  The 2003 SPD, expressly stated: "Raytheon hopes to continue the Plans indefinitely, but as is customary in such plans, the right to amend, suspend, or terminate the Plans in whole or in part at any time and for any reason is reserved by Raytheon."  (D's MSJ at 7; SOF at 59.)

Raytheon argues that Plaintiffs' medical benefits are "governed" by the terms of the Plan, pursuant to express provisions in the CBAs which defer to the Plan, as follows: "All benefits of employees, retired employees, laid off employees and insured dependents are subject in every respect to the terms of the applicable Plan documents under which payment is claimed."  (D's MSJ at 14 (citing 1990 CBA, Article XIII, Section J(5)).)

The Court considered this same argument in Raytheon's Motion to Dismiss and rejected it to the extent Raytheon argued that the Plan could circumvent or extinguish benefit rights secured by a CBA.  (Order, filed 8/8/2006, at 12.)  As this Court explained in 2006, CBAs negotiated by unions and employers establish the contractual relationship between employees and employers and cannot be unilaterally changed because there would be a lack of mutuality. *Id.* (citations omitted.)  There is a distinction between entitlement to benefits under a CBA, which have resulted from a process of collective bargaining as compared to entitlement to benefits under an ERISA plan, which has been adopted by an employer at its discretion. *Baumgardner v. Smurfit-Stone Container*, 347 F. Supp. 2d 927, 933 (Or. 2004) (citing *Krishan v. McDonnell Douglas Corp.*, 873 F. Supp. 345, 351 (Cal. 1994).

Again this Court finds that to the extent Raytheon suggests that an ERISA document can override a collective bargaining document, the law is to the contrary.  To the extent that Raytheon suggests that an ERISA document can override a provision in a CBA, the Court rejects this argument and notes that the Plan document provisions relied on by Raytheon expressly provide exceptions in the anti-vesting and reservation of rights provisions for benefit programs provided under a CBA.  (See emphasis added above.)  This Court will look to the Plan documents as evidence of what the parties intended in the CBAs regarding vesting of health care benefits for retirees.

Here, the CBAs control, and if Plaintiffs prevail under the LMRA they also prevail under ERISA because the benefits due them under the CBAs are the benefits due them under ERISA.

D.   The Labor Management Relations Act: (LMRA)

In 1971, the Supreme Court made it quite clear that retirees were not employees covered by mandatory NLRA collective bargaining provisions requiring employers to negotiate all "terms and conditions of employment." *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Comp.,* 404 U.S. 157, 164-170 (1971).  In *Allied Chemical*, the Supreme Court considered a unilateral change by an employer in retiree health insurance, covered by a CBA.  The Court held that the mandatory obligation to negotiate "conditions of employment" under the NLRA applied to employees, distinguishing between active employees and retirees.

*Id.* Only retirement benefits for active employees are a mandatory bargaining subject, retirees' benefits are not and, therefore, the employer may unilaterally modify the retirees' health insurance plan without violating the mandatory bargaining requirements of the NLRA. *Id.* at 175-184.

The Supreme Court noted, however, that nothing "precludes permissive bargaining over the benefits of already retired employees." *Id.* at 171 n. 11. Additionally, "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent." *Id.* at 182 n. 20 (citation omitted). "Moreover, the retiree would have a federal remedy under § 301 of the Labor Management Relations Act for breach of contract if his vested benefits were unilaterally changed. *Id.* (citing *See Smith v. Evening News Assn.*, 371 U.S. 195, 200-201 (1962); *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470 (1960)).

Since *Allied Chemical*, it has been quite clear that bargained-for retirement benefits will be subject to unilateral changes by employers, unless they are vested rights. *See also*, *Toensing v. Brown*, 528 F.2d 69, 72 (9th Cir. 1975) (a union is not required to negotiate benefits for retirees, but it may do so, and if it does, vested retirement rights are not to be disturbed.)

In 1979, the Ninth Circuit considered a class action law suit on behalf of retired dairy employees who sued five labor organizations and six employers for restoration of health and welfare benefits for retirees. A series of CBAs required the employer to maintain the benefits "in effect, on the date of the agreement," and throughout the term of each agreement. The benefits continued in this sequential fashion through an established fund, which provided medical and hospital benefits for retiring employees, and was funded by the necessary amount of employee contributions based on the number of employee work hours required to so maintain the retirees' health benefits. *Turner v. Union # 302, International Brotherhood of Teamsters*, 604 F.2d 1219, 1222 (9th Cir. 1979).

This arrangement existed from 1966 to 1974, when financial problems in the dairy industry resulted in the union and the employer agreeing to amend the CBA to delete the requirement to maintain the present existing level of benefits for retirees. *Id.* at 1223. "The

central question presented [was] whether . . . [the] retirees had a vested contractual right in the collective bargaining agreement, and the unions and employer violated that right by amending the agreement without the consent of the retirees." *Id.* at 1224.  The court concluded the amendment to the CBA did not constitute a breach because the benefits were not vested rights. *Id.* at 1226.

In discussing the contractual nature of the agreement, the court noted that CBAs are more than a contract.  They are a "generalized code" governing a myriad of situations which cannot be wholly anticipated.  As compared to a general contract, a CBA must be more flexible and subject to change for the following reason:

> A collective bargaining contract operates prospectively over a substantial period of time and the parties cannot be expected to foresee all the problems that will develop in an industrial establishment within the period of the contract and more scope must be left for decisions made in the course of performing the agreement. The parties to the collective bargaining agreement share a degree of mutual interdependence for the cost of disagreement is great and the pressure to reach agreement is so intense that the parties are willing to contract with the thought in mind of working out the problems of interpreting and amending when the inevitable problems arise.

*Id.*

In 1983, the Ninth Circuit looked at the question of whether rights created by a CBA were vested or subject to change, when airline pilots sued their union and employer for agreeing to free the airlines from a buy-back program which paid additional compensation to pilots who agreed to work during their vacation.  *Hendricks v. Airline Pilots Assoc., International and United Airlines*, 696 F.2d 673 (9th Cir. 1983).  The court held that the application of general contract law in a collective bargaining case is distinguishable because CBAs are essentially instruments of government, not merely contracts of exchange.  *Id.* at 676 (citations omitted).

The court explained that rights created by collective bargaining ordinarily are extinguished by subsequent collective bargaining.  A contrary irrevocable agreement must be based on the conclusion that the parties intended to relinquish control over important aspects of the employment relationship for a substantial period of time.  "An intention to agree to such an unusual abdication of collective bargaining responsibility should be attributed to the parties

1   only on the strongest of evidence." *Id.* (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 470-

2   71 (1960)).

3        The collective bargaining relationship is a continuing relationship. "'The assumption as

4   well as the aim of [the LMRA] is a process of permanent conference and negotiation between

5   [employers] on the one hand and the employees through their unions on the other.'" *Id.* at 676

6   (quoting *International Ass'n of Machinists v. Street,* 367 U.S. 740, 760 (1961) (quoting *Elgin,*

7   *Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 753 (1945) (Frankfurter, J., dissenting)).

8   Relying on *Turner*, the court noted the need for flexibility to modify the collective bargaining

9   agreement to meet changing conditions. *Id.* In *Hendricks*, as financial circumstances changed

10  the CBAs correspondingly changed to reflect the best interests of the majority of employees.

11  While some pilots lost buy-back benefits, more pilots' jobs were saved. Finding that benefits

12  are vested and irrevocable is contrary to the majoritarian bias inherent in collective bargaining.

13  *Id.* at 677-678. The court declined to find vested benefits in the CBA, minus the strongest of

14  evidence that the parties intended to give up their flexibility.

15       Against this general background for interpreting whether or not a CBA provides vested

16  benefits and the holding in 1971 by the Supreme Court in *Allied Chemical*, this Court declines

17  to adopt any presumption, based on *Local 134, UAW v Yard-Man*, 716 F2d 1476 (6th Cir. 1983),

18  that health and welfare retirement benefits are vested benefits. *See Anderson v. Alpha Portland*

19  *Industries*, 836 F.2d 1512, 1515-19 (8th Cir. 1988) (disagreeing with *Yard-Man* to the extent it

20  recognizes an inference of an intent to vest and criticizing cases that have extended dicta in

21  *Yard-Man* to create a presumption in favor of vesting); *Yolton v. El Paso Tenn. Pipeline Co*, 435

22  F.3d 571, 579 (6th Cir. 2006) (explaining that the inference discussed in *Yard-Man* does not

23  involve burden shifting).[3]

24  ────────────────

25       [3]Some circuits following *Yard-Man*, apply a pro- retiree presumption of vesting, but other
    circuits rely on ERISA and apply a presumption against vesting. *E.g., Gable v. Sweetwater Cup*
26  *Co., Inc.,* 35 F.3d 851, 857-58 (4th Cir. 1994) (citing 29 U.S.C. 11101.0, ERISA, and noting that
    Congress only mandated vesting for  pensions and not retiree health benefits plans). This
27  ignores that ERISA was not designed to leave plan participants worse off than they were under
28  pre-ERISA state law, *e.g.,* 29 U.S.C. 1114; *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987);

1    This Court will look to *Yard-Man* as a contextual guide for interpreting the CBAs.

2   *Yolton*, 435 F.3d at 579.  Like this Court, the *Yard-Man* court recognized that after *Allied*

3   *Chemical*, retirees' retirement health care benefits are not mandatory nor required to be included

4   in a CBA, therefore, when active employees bargain for retirement benefits it would be unlikely

5   that they would leave these benefits to the contingencies of future negotiations, especially

6   because retirement benefits are "typically understood as a form of delayed compensation or

7   reward for past services," *Id.* at 579-80 (citing *Yard-Man*, 435 F.2d at 1482).

8    The legal frame work of the LMRA claim in respect to Defendant's motion for summary

9   judgment is "fairly straightforward: "If each collective bargaining agreement unambiguously

10  limited medical benefits to the term of the agreement, no benefits were vested."  *Bower v.*

11  *Bunker Hill Co.*, 725 F.2d 1221, 1223 (9th Cir. 1984)  (citing *Turner v. Local Union No. 302,*

12  *International Brotherhood of Teamsters,* 604 F.2d 1219, 1225 (9th Cir.1979)).   "The sole

13  question is whether the collective bargaining agreements unambiguously limited the term [or

14  cost] of the medical benefits."  *Id.*

15   It is exactly the opposite for the Plaintiffs: "If the pensioners' medical insurance

16  constituted a vested benefit, that benefit could not be ended without the pensioners' consent."

17  *Bower*, 725 F.2d at 1223 (9th Cir. 1984) (citing *Allied Chemical,* 404 U.S. at 181 n. 20).  For

18  Plaintiffs to prevail, the CBAs must have unambiguously obligated the employer to make

19  contributions beyond the term of the agreement, and it must have eliminated the employer's

20  power to modify the type or level of benefits.

21   In the Ninth Circuit, a court first looks to the language of the CBAs.  *Bowers*, 725 F.2d

22  at 123-1224. "Written terms are ambiguous only if multiple reasonable interpretations exist."

23  *IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008) (citation

24  ─────────────────────

25  *see also Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984) (underlying
    purposes of ERISA is to protect the interests of participants in employee benefit plans);

26  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989) (rejecting interpretation of
    ERISA that would result in it affording less protection to employees than they enjoyed pre-

27  ERISA), and pre-ERISA,  parties were allowed to contract for vested retirement benefits.

28  *Allied Chemical*, 404 U.S. at 182 n. 20.

omitted).   In other words, "A term is ambiguous if it is subject to reasonable alternative interpretations." *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1389 (7th Cir.1993) (internal quotation and citation omitted).   "[O]nly by excluding all alternative readings as unreasonable may [a court] find that a plan's language is plain and unambiguous." *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1110 (9th Cir.2000).

The CBA terms are interpreted in the context of the entire agreement's language, structure, and stated purpose. *IBEW-NECA Pension*, 519 F.3d at 1047.  Terms should not be isolated in a CBA in order to create an ambiguity where none exists.  *Id.*

When contract language is not clear, a court can generally consider extrinsic evidence to determine the intent of the parties, and this principle is applied with liberality in the case of a CBA. *Arizona Laborers, Teamsters and Cement Masons Local v. Conquer Cartage Co.,* 753 F.2d 1512, 1517-1518 (9th Cir. 1985).  It is, nevertheless, error to consider extrinsic evidence to contradict unambiguous terms. *IBEW-NECA Pension*, 519 F.3d at 1048 (citing *Pace v. Honolulu Disposal Services, Inc.*, 227 F.3d 1150, 1157-58 (9th Cir. 2000)).  Consequently, this Court first considers the contractual language to resolve the lawsuit before it will look to extrinsic evidence to determine the intent of the parties.  *Cf., Bower*, 725 F.2d at 1223-1224 (looking to extrinsic evidence to determine if summary judgment was proper after concluding the contract language did not speak to the issue of vesting).

If there is a dispute over a material fact necessary to interpret the contract, there is an ambiguity that must be determined at trial. *Bower*, 725 F.2d at 1223 (citing *National Union Fire Insurance of Pittsburgh, Pennsylvania v. Argonaut Insurance Co.,* 701 F.2d 95, 97 (9th Cir.1983)).  Substantive law that governs a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000).  If resolution of a factual dispute would not affect the outcome of the claim, the fact is not material. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

Summary Judgment will only be granted if "the contract provision in question is unambiguous." *Id.* (citing *Castaneda v. Dura-Vent Corp.,* 648 F.2d 612, 619 (9th Cir.1981)).

E.   Summary Judgment

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to material fact." Fed.R.Civ.P. 56(c).  In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986).

Motions for summary judgment are not disfavored procedural shortcuts, but "rather are an integral part of the Federal Rules as a whole, which are designed 'to secure just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted).  Accordingly, the rules governing motions for summary judgment are enforced with equal regard for the rights of both the nonmovant and the movant. *Id.*   The Judge's role on a motion for summary judgment is not to determine the truth of the matter or to weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The inquiry mirrors the standard for a directed verdict: whether the evidence reveals a factual disagreement requiring submission of the case to a jury or whether evidence is so one sided that one party must prevail as a matter of law.

The party with the burden of proof at trial also bears that same burden when making or opposing a motion for summary judgment. *Celotex*, 477 U.S. at 322.  The Plaintiffs bear the burden of proving their case; Plaintiffs bear the burden of establishing unambiguously that the contract provisions at issue, here, have vested.  *Bower*, 725 F.2d at 1223.

F.   The Collective Bargaining Agreements

It is undisputed that from 1972 to 1999, the CBAs, each covering three or four years, provided for company-paid medical benefits for retirees, their spouses and eligible dependents. It is undisputed that the 2003 CBA eliminated Raytheon's obligation to pay medical premiums for retirees, their spouses and dependents, and required retirees to make a monthly payment for

health care benefits.  Effective July 1, 2004, retired employees began receiving monthly bills from Raytheon for health care benefits.

Plaintiffs are retirees under CBAs for 1990, 1993, 1996, and 1999.  The 1990-1996 CBAs were negotiated with Raytheon's predecessor, Hughes Missile Systems Group.  Raytheon Company merged with Hughes Aircraft Company in 1997, and Raytheon was substituted as the employer to the 1996 CBA.  Thereafter, Raytheon negotiated the CBAs with the Plaintiffs' Union, International Association of Machinists and Aerospace Workers, AFL-CIO and its old Pueblo Lodge, No. 933.

<u>The 1990 CBA</u>

The CBA, effective October 23, 1990, Article XIII covered group benefit plans, as follows: § A: Employee and Dependent Medical Coverage; § B: Basic Life Insurance; § C: Retiree Group Life Insurance Plan; § D: Retired Employees Medical Benefits; § E: Optional Group Life Insurance; § F: Income Insurance; § G: Voluntary Supplemental Accidental Death and Dismemberment Insurance; § H: Vision Care; § I: Temporary Disability Benefits; § J: General Provisions; § K: Dependent Life Insurance, and § L: Flexible Spending Account.  (Ps' MSJ, SOF, Ex. 7: 1990 CBA.)

Article XIX, General Provisions, § D, Maintenance of Benefits and Privileges, provided: "No employee shall suffer a loss of any benefits or privileges previously enjoyed as a result of this Agreement."  Section F, Current and Supplemental Agreements, specified that the 1990 CBA constituted the sole and entire existing agreement between the parties and superseded all previous agreements between the Company and the Union and the covered employees, and expressed all obligations of, and restrictions imposed on, the Company and the Union for the period of the Agreement.  *Id.*

In the 1990 CBA, Group Benefits for active employees were expressly limited for the "term of this agreement" as follows: Employee and Dependent Medical Coverage, § A(1), (3); Optional Group Life Insurance, § E(1); Income Insurance, § F(1); and Vision Care,  § H(1). The CBA did not expressly limit to the "term of this agreement," other active employee group

benefits that the Employer promised to either make available or continue to make available, as follows: Basic Life Insurance, § B(1); Retiree Group Life Insurance Plan, § C; Voluntary Supplemental Accidental Death and Dismemberment Insurance, § G(1); Temporary Disability Benefits, § I; Dependent Life Insurance, § K, and Flexible Spending Account, § L.   These agreements were, however, necessarily limited by "the term of this agreement" because the 1990 CBA included the integration clause that it was "the sole and entire existing agreement between the parties and superseded all previous agreements between the Company and the Union and the covered employees, and expressed all obligations of, and restrictions imposed on, the Company and the Union *for the period of the Agreement*."  *Id.* at Article XIX(F).

Accordingly, all the Group Benefits were limited by the three-year term of the agreement, except for Retired Employees Medical Benefits, which the Employer agreed to provide for active employees as follows:

Section D. Retired Employees Medical Benefits

1.    For employees who hereafter retire, with at least three (3) years of continuous participation in the contributory option of the Retirement Plan immediately preceding the employee's date of retirement, and who are at least age 55 but less than age 65 and who have five (5) or more years of continuous employment with the Employer, the *Employer agrees to continue to provide the Comprehensive Medical Plan coverages for which they were covered while active employees*, until the retired employee attains age 65, and shall likewise continue the same Comprehensive Medical Plan coverages for his or her eligible spouse until the spouse attains age 65. Coverage shall be continued under this provision for the retired employee's dependent child until the child reaches age twentyone (21), or age twenty-five (25), if attending an accredited college, university, or career-oriented educational institution which requires regular full-time attendance in a predetermined training syllabus with a set pattern of progression towards completion of the program. (Emphasis added.)

*Id.* at Article XIII, § D at 73.)

Only this employee benefit included a specified time limit other than the term of the agreement. Unequivocally and expressly, the Employer agreed to continue to provide employees who retired during the term of the agreement, who were at least age 55 but less than age 65, with the same Comprehensive Medical Plan coverages they were receiving while active employees *until the employee attained age 65, and the retired employee's spouse attained age*

*65, and the retired employee's dependent child reached the age of 21 or 25, if attending an accredited college or university.*  There is no ambiguity in this language, which granted employees retiring from 1990 to 1993 vested retirement medical benefits until the age of 65.

Raytheon notes that it continues to provide these health benefits to the Plaintiffs.  (D's Opposition to Ps' MSJ (Opposition) at 5; D's MSJ at 9.)  The only change has been to the premium structure, effective July 1, 2004, which Raytheon argues was authorized by the Plan and the 2003 CBA because any vested right to medical benefits until the age of 65 did not include a right to receive these benefits free of charge.  *Id.*

Raytheon argues that it agreed to provide retirees with the same benefits they had as active employees, which were not vested and could be changed or terminated at the Employer's discretion.  (DR's MSJ at 13.)  Because these benefits were not vested, they terminated with the CBA.  *Id.*  Raytheon's arguments against Plaintiffs claim to vested "free" medical benefits are aimed at the entirety of the retirees' right to medical benefits and not just at their claim for benefits at no cost.

According to Raytheon, the Employer agreed to provide medical benefits during the term of the Agreement, until a retiree attained the age 65.[4]  In other words, the Employer agreed to provide medical benefits during the term of the Agreement to retirees who had <u>not</u> attained age 65.  Under Raytheon's interpretation the express provision  "until age 65" does not operate to establish the duration of benefits because benefits are limited by the term of the CBA.  Under Raytheon's interpretation of the CBA, "until age 65" is a criteria for eligibility.  This agreement was made by active employees that were over age 55, but under age 65, who had not yet retired and who would have no future bargaining rights to protect their interests after retirement.  Raytheon's interpretation of the CBA is not reasonable given that retirement benefits are delayed forms of compensation and there is such a great disparity between the value of health

---

[4]For the sake of brevity, the Court does not recite the full provision, which is "until the employee attained age 65, and the retired employee's spouse attained age 65, and the retired employee's dependent child reached the age of 21 or 25, if attending an accredited college or university. . .."

care benefits if a retiree receives benefits until the age 65 as compared to only receiving benefits for the duration of the CBA. Raytheon's interpretation is especially unreasonable given that the active employees bargaining for these retirement benefits were already over age 55, but under age 65, and had not yet retired.

It is not reasonable to interpret the language in the CBA, "until the retired employee attains age 65" as an eligibility criteria. Raytheon does not offer a reasonable alternative interpretation of the language which this Court finds clearly and expressly establishes the duration of the promised medical benefits to be "until the retired employee attains age 65." Since 1971 and *Allied Chemical*, it is clear any less express and specific commitment would allow the Employer to unilaterally change or end the promised retirement benefit at the end of the CBA.

The Court does not agree with Raytheon's assertion that the "marked contrast" in pension benefits which "were expressly referred to as being 'vested'" is "telling," (D's MSJ at 8), because these express vesting provisions are contained in Retirement Plan documents and not in the CBAs. Like the Health Benefit Plans which expressly stated that medical benefits were not vested, the Retirement Plan documents expressly stated that retirement pension benefits were vested. While the latter vesting requirements are specifically provided for under ERISA, the former are not and are instead exempt from ERISA vesting requirements. The CBAs at issue here neither expressly declare the Retirement Benefits nor the Retired Employees Medical Benefits to be "vested." Raytheon offers no case law, and the Court has found no case law, to support a requirement that a CBA must expressly state benefits are "vested."

The Court finds that there is no ambiguity in the 1990 CBA, which grants employees retiring from 1990 to 1993 vested retirement medical benefits "until age 65."

Employees retiring under the 1990 CBA have a vested right to "Comprehensive Medical Plan coverages for which they were covered while active employees," until age 65. Therefore, the answer to the question of "free" medical benefits hinges on the medical coverage provisions

1  for active employees in the 1990 CBA: Article XIII, § A, Employee and Dependent Medical
2  Coverage.

3      Under the 1990 CBA, from 1990 to 1993, active employees were entitled to medical
4  coverage, pursuant to the Comprehensive Medical Plan, which was "subject to the terms,
5  conditions and exclusions contained in the Plan documents and as summarized in the SPD. (Ps'
6  MSJ, SOF, Ex. 7: 1990 CBA at Article XIII, § A(1)).  Under the CBA, the employer agreed to
7  offer employees specific HMO plans as alternatives to the Comprehensive Medical Plan.  *Id.*
8  at § A(4).  The Employer agreed to pay the lesser of the applicable premium for the alternative
9  HMO plan or the Comprehensive Medical Plan.  *Id.* § A(5).  "Effective January 1, 1992,
10  employees were to receive a weekly payment from the Employer, incur no cost, or pay a weekly
11  co-payment," according to schedules specified in the CBA, which specified that there would
12  be "no cost" for the Comprehensive Medical Plan.  *Id.* at § 5.

13      In the 1990 CBA, the Employer agreed to pay certain benefit premiums for active
14  employees during the term of the Agreement, including the "premiums for the . . .
15  Comprehensive Medical Plan (subject to the provisions of Article XIII, § A)."  *Id.* at Article
16  XIII, § J(1).  Nothing in the 1990 CBA was to change any provisions of the Group Benefit Plans
17  that were currently in effect, except as was specifically provided for in the 1990 CBA.  *Id.* at
18  § J(4).  "All benefits of employees, retired employees, laid off employees and insured
19  dependents [were] subject in every respect to the terms of the applicable Plan documents under
20  which payment are claimed."  *Id.* at § J(5).  These two provisions ensured that the Plan would
21  reflect the provisions agreed to in the CBA.

22      The Plan documents are not to the contrary.  The express "no vesting" provision in the
23  Plan, contains an express exception for benefits "specifically provided under a Benefit
24  Program."  (D's MSJ, SOF, Ex. D(3)(4): 1999 Plan at 17; 2003 Plan at 26).  The reservation of
25  rights provision in the Plan expressly excepts "benefits provided in any agreement with a
26  Collective Bargaining Agent."  *Id.* at D(2): 1997 Plan at 20.

27

28

1   Nothing in the CBA was to result in "a loss of any benefits or privileges previously
2   enjoyed as a result of this Agreement." (Ps' MSJ, SOF, Ex. 7: 1990 CBA at Article XIX, § D.
3   Raytheon explains that this maintenance clause "meant simply that active employees' benefits
4   and privileges *under a particular CBA* could not be unilaterally reduced while *that CBA was*
5   *in force*. (D's Opposition at 7.) Accordingly, if the CBA granted vested retirement benefits to
6   active employees retiring during the term of the CBA, such benefits and privileges could not
7   be unilaterally reduced or lost while that CBA was in force by making them "not vested" in Plan
8   documents.

9   Under the 1990 CBA, *active employees* were unambiguously entitled to Employer paid
10  premiums for medical benefits provided under the Comprehensive Medical Plan. This was a
11  binding agreement by the Employer, which could not be changed, altered, or amended by any
12  Plan document, during the term of the 1990 CBA. *cf.,* (D's Opposition at 7 (explaining that
13  active employees' benefits and privileges *under a particular CBA* could not be unilaterally
14  reduced *while that CBA was in force*.)

15  Raytheon argues that the Employer's agreement to provide "coverages" was limited to
16  only the content of the insurance being provided active employees, not its cost,    (D's
17  Opposition at 5.) This is not a reasonable interpretation of the CBA because the CBA only
18  specified that coverage would be through the Comprehensive Medical Plan and did not specify
19  the content of the coverage. The term "coverages," in Article XIII, § A: "Employee and
20  Dependent Medical 'Coverage,'" included the Employer's agreement to provide medical
21  benefits to employees through alternative health care plans or the Comprehensive Medical Plan,
22  *id.* at A(1)(4), and the Employer's agreement to pay the cost of premiums for the
23  Comprehensive Medical Plan, *id.* at A(5).

24  The Court finds that there is no ambiguity in the 1990 CBA, which grants employees
25  retiring from 1990 to 1993 vested medical benefits until age 65 under the "Comprehensive
26  Medical Plan" at "no cost."

27
28

- 17 -

1    Raytheon is correct that the "no cost" provisions expired with each CBA. (D's

2  Opposition at 8.) Raytheon was free to change the Retired Employees Medical Benefits after

3  the 1990 CBA, which it did when it eliminated the "no weekly premium" clause in the 2003

4  CBA.  While this ended free premiums as of 2003, this did not change the benefits received by

5  active employees from 1990 to 1993, which included medical benefits under the

6  "Comprehensive Medical Plan" at "no cost." Under the express terms of the CBA, employees,

7  who retired under the 1990 CBA, have a vested right to receive the same medical benefits they

8  received while active employees, until they attain age 65, i.e., they are entitled to benefits under

9  the Comprehensive Medical Plan at no cost. (Ps' MSJ, SOF, Ex. 7: 1990 CBA at Article XIII,

10 § D.)

11    Raytheon argues that language in the CBAs that the Employer agreed to continue to

12 provide certain coverages, including retiree medical benefits, reflects that the benefits were not

13 vested because if benefits are truly vested, it is unnecessary for each new CBA to provide that

14 they continue. (D's MSJ at 13) (citations omitted).  This argument ignores that agreements in

15 each CBA expire with each CBA and that the "Retired Employees Medical Benefits," § D,

16 provision in the CBAs was a benefit for active employees, not retired employees.   The

17 continuation clause ensured active employees, who would retire under a particular CBA, that

18 they too, like retiring employees under previous CBAs, would receive medical health care

19 benefits at no cost until age 65.  In other words, Raytheon was free with each subsequent CBA

20 to change, modify, or stop providing any benefit, including the vested retirement medical

21 benefits or continue benefits.  Until 2003, Defendant expressly stated in each CBA that it would

22 continue to provide vested retirement medical benefits at no cost to active employees retiring

23 during the term of the agreement.  As of 2003, this benefit was no longer continued; instead, the

24 CBA provided for Raytheon to pay up to $256 per month towards the premium costs of medical

25 coverage under a Raytheon-sponsored Plan. (D's MSJ, SOF, Ex. 9: 2003 CBA at Article XIV,

26 § D(4(a)).

27 /////

28

The Other CBAs: 1993, 1996 and 1999

The relevant provisions in the 1993 CBA were identical to the 1990 CBA.  In the 1996 CBA, Article XIII, § D of the 1990 and 1993 CBAs became Article XII, § D, with the addition of the following provision:

> 5.     For employees retiring under . . . Section D, 1, . . . the retiree medical benefit will be administered as follows:  . . . (e) there is *no weekly premium/charge* for the Preferred Plan, the Hughes Medical Plan, or an HMO. (emphasis added)

(Ps' MSJ, SOF, Ex. 9: 1996 CBA at Article XII, § D(5)).  Section J, promising employer paid premiums for active employees remained the same in the 1996 CBA as it was in 1990 and 1993 CBAs.

Under the 1996 CBA, there is no need to determine whether the retirees' "coverages while active employees" were at no cost by referring to the CBA's provisions for active employees: Section A: Employee and Dependent Medical Coverage.  In the 1996 CBA, § D, which provided medical benefits for retirees until age 65, included the express provision that these benefits would be at "no weekly premium/charge."  *Id.* at Article XIX, § D(5).

The Raytheon merger with Hughes occurred in 1997, and Raytheon negotiated the 1999 CBA with mirror images of the 1996 CBA provisions for medical retirement benefits in § D, except it reduced coverage for dependent children of retirees.  The 1999 CBA contained the same pertinent parts of preceding CBAs that this Court relied on to determine vesting, including the addition of ¶ 5 in § D from the 1996 CBA which expressly provided that retiree benefits would be at "no weekly premium/charge."

On January 26, 2004, Raytheon and the Union signed the 2003 CBA, which eliminated the provisions for employer paid premiums in § D(5): Retiree Medical Benefits.  Instead employees retiring under the 2003 CBA pay up to $256 per month for themselves and up to $256 per month for a spouse/same-sex domestic partner towards a Raytheon-sponsored plan.  The 2003 CBA also changed the language in § D, which linked retiree benefits to the coverages they received while active employees and instead, the Employer agreed to "continue to provide

the Raytheon Medical Plans *available to active employees . . .*, until the retired employee attains

age 65, and . . ..”  (D's MSJ, SOF, Ex. 9: 2003 CBA at Article XIV § D(1)).

G.      Conclusion

        The Court finds that the 1990-1999 CBAs unambiguously provide vested medical

benefits for retirees until age 65 at no cost based on clear and express provisions discussed

above. *See* (D's Opposition at 2 (citing *UMW v. Brushy Creek Coal Co.*, 410 F. Supp. 2d 723,

733 (S.D. Ill. 2066) (intent to vest must be clear and express)).   The Court finds no other

reasonable interpretation of the express and clear language in the CBAs.  There being no

ambiguity in the CBAs, the Court does not consider any extrinsic evidence regarding the

parties' intent to provide or not to provide these vested benefits.

        **Accordingly,**

        **IT IS ORDERED** that the Defendant's Motion for Summary Judgment (document 105)

is DENIED.

        **IT IS FURTHER ORDERED** that the Plaintiffs' Motion for Summary Judgment

(document 106) is GRANTED.

        **IT IS FURTHER ORDERED** that the Plaintiffs' Motion for Preliminary Injunction

(document 79) is DENIED AS MOOT.

        **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment for

Plaintiffs, ordering the Defendant to restore retiree health care benefits to the levels that existed

prior to July 1, 2004, compensate class members for premiums that they paid since July 1, 2004,

and permanently enjoin the Defendant from, hereafter, eliminating or reducing retiree health

care benefits for the class members contrary to the CBAs.

        DATED this 4th day of August, 2008.

David C. Bury
United States District Judge